IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| DURWOOD BELLMONT OSTERHOUT,<br><br>Plaintiff,<br><br>vs.<br><br>CAPTAIN SETH M. WENZEL and<br>OFFICER KOSTELECKY,<br><br>Defendants. | CV 19-00024-H-JTJ<br><br>ORDER[1] |

Pending are Defendants' Motion to Deem Requests for Admission Admitted (Doc. 36), Motion for Summary Judgment (Doc. 41), and Motion to Deem Defendants' Motion re: Admissions (Doc. 36) Well Taken (Doc. 52). Defendants' motions will be granted and this matter will be dismissed.

## I. MOTION TO DEEM ADMISSIONS WELL-TAKEN

Defendants served two requests for admission upon Plaintiff Durwood Osterhout on September 16, 2019 in which they asked Mr. Osterhout to admit that the Broadwater Counter Detention Center's Medication Record for January 2018 (Doc. 37-1 at 16) and a Request to Release Medical Records to the Broadwater

---

[1]Pursuant to 28 U.S.C. § 636(c), Fed.R.Civ.P. 73, the parties have provided written consent to have the undersigned conduct all further proceedings, enter judgment, and conduct all post-trial proceedings in the above-captioned matter. (Doc. 19.)

1

County Detention Center's Medical Department (Doc. 37-1 at 17) were true and accurate copies. Mr. Osterhout did not timely respond to the requests but on November 25, 2019 he responded to Defendants' discovery requests and argued that the medication record was not a true and accurate copy because he did not refuse his medications on January 29, 2018. (Doc. 37-3 at 13.)

Rule 36(a)(3), Fed. R. Civ. P. provides that "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney."

The Court will accept the documents presented as business/medical records for authentication purposes. But Mr. Osterhout disputes that he refused his medications on January 29, 2018. As set forth below, whether Mr. Osterhout refused his medications on that date does not change the Court's analysis of his claims. Accordingly, out of an abundance of caution, the Court will grant the motion in part, but it has not relied upon this evidence to establish that Mr. Osterhout refused his medications on January 29, 2018.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Under summary judgment practice, "[t]he

2

moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B). Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. In such a circumstance, summary judgment should be

granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed.R.Civ.P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. "A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"In evaluating the evidence to determine whether there is a genuine issue of

fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

Defendants advised Mr. Osterhout of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure in the April 20, 2020 "Notice and Warning to Plaintiff" (Doc. 43). *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998)(en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

### III. FACTS

In January 2018, Plaintiff Durwood Osterhout was a pretrial detainee at the Broadwater County Detention Center ("Detention Center"). (Defendants' Statement of Undisputed Facts, Doc. 44 (hereinafter "SUF") at ¶¶ 1, 4.) Mr. Osterhout experienced seizures prior to his arrival at the Detention Center. He believes he had his first seizure when he fell in the shower while incarcerated in Gallatin County on December 27, 2017. (SUF at ¶ 5.) Mr. Osterhout believes he suffered a traumatic brain injury during the December 27, 2017 fall which caused

his subsequent seizures. He claims he will need to take seizure medication for the rest of his life as a result. (SUF at ¶ 6.)

Mr. Osterhout believes his next seizure occurred on January 2, 2018 at his home. (SUF at ¶ 7.) Mr. Osterhout wet himself during this seizure. He admits that wetting oneself is common with seizures. Mr. Osterhout did not go to the doctor after this seizure. (SUF at ¶ 8.) When Mr. Osterhout has a seizure, not only does he wet himself, but he has sore muscles and becomes disoriented and confused. The severity of his disorientation and confusion increases with the severity of the seizure. (SUF at ¶ 9.)

Mr. Osterhout claims to have experienced two seizures on January 28, 2018, while incarcerated at the Detention Center. (SUF at ¶ 11.)[2] The first appears to have occurred during the early morning hours of January 28, 2018. After this first seizure, Mr. Osterhout was taken to the Broadwater Health Center in Townsend, Montana. The ER Provider Care Documentation for the Health Center indicates Mr. Osterhout was there between approximately 2:40 a.m. and 4:30 a.m. on January 28, 2018. (Doc. 44-3 at 85-86.) The medical records indicate that a guard reported that Mr. Osterhout suffered a 30+ minute long seizure at the jail during

---

[2] In his Complaint, Mr. Osterhout indicates he was taken to the hospital on January 26, 2018 (Doc. 2 at 7) and on January 27, 2018 (Doc. 2 at 6.) The medical records from St. Peters Hospital indicate that he was seen there on January 28, 2018 (Doc. 44-3 at 102-103) and Mr. Osterhout now recognizes these seizures occurred on January 28, 2018 (as opposed to January 29, 2018). (SUF at ¶ 13.)

which he would clench his fists and hold himself quite tightly and then relax, he was unresponsive, and lost bladder control. (Doc. 44-3 at 49.) Mr. Osterhout was observed for over two hours at the Health Center with no further seizure activity and was released. *Id.*

Mr. Osterhout was returned to the Detention Center early in the morning on January 28, 2018. There is some indication in the record that at some point during the day (January 28, 2018) Mr. Osterhout was assaulted by other inmates and "was punched in the head." (Doc. 44-3 at 75.) Subsequently, PA Greg Sayers from Broadwater Health Center was asked by the ambulance to accompany them to the jail to evaluate Mr. Osterhout who had a second event which they called a seizure. According to PA Sayers addendum report, Mr. Osterhout reported another seizure after the assault during which he urinated on himself. He was then put in a private cell and put on a pad on the ground and after a few moments he had another seizure during which he again urinated on himself and bit the tip of his tongue. PA Sayers determined it was necessary to get an EEG and CT exam and so Mr. Osterhout was transported to St. Peter's Hospital in Helena. (Doc. 44-3 at 75.)

Mr. Osterhout arrived at the hospital at 6:12 p.m. and was discharged at 10:22 p.m. (Doc. 44-3 at 102-103.) Dr. Andrew Michel examined Mr. Osterhout. While it was not clear that Mr. Osterhout had suffered a seizure, Dr. Michel felt it was warranted to start Mr. Osterhout on Keppra until he was able to follow up with

7

neurology.  (Doc. 44-3 at 83.)  Neither Defendant was in the treatment room when Mr. Osterhout was examined.  (Doc. 44-2 at 9:  Osterhout Depo. at 115.)

The patient instructions from St. Peter's Hospital indicate that Mr. Osterhout was to see Dr. Clark in neurology in 7-10 days, he was prescribed Keppra, and was advised that he should not drive until cleared.  (Doc. 44-3 at 96.)  There is a prescription in the record for Keppra from St. Peter's Hospital.  (Doc. 44-3 at 95.)  Neither the prescription nor the patient instruction indicates that Mr. Osterhout was at risk of having another seizure if the medication was not provided by 8:00 a.m. the next morning as alleged in Mr. Osterhout's Complaint.  (Doc. 44-3 at 95-96; SUF at ¶ 19.)

Mr. Osterhout was released from the hospital at approximately 10:22 p.m. and returned to the Detention Center where he was placed in the middle holding cell.  (Doc. 44-3 at 103; Doc. 44-2 at 8:  Osterhout Depo. at 112.)  He got up at 7:00 a.m. for breakfast which he ate in his cell.  (Doc. 44-2 at 9:  Osterhout Depo. at 114.)  Medical pass was between 7:00 a.m. and 9:00 a.m.  Nurse Karen was pushing the medication cart, but she did not stop to provide Mr. Osterhout any medications even though Mr. Osterhout banged on the window of his cell.  (Doc. 44-2 at 10:  Osterhout Depo at 118-119.)  Mr. Osterhout testified that he assumed they did not have his medication at the first medical pass because Townsend Drug does not open until 8:00 a.m. or 9:00 a.m. and they had probably not picked up his

8

medication yet. (Doc. 44-2 at 11: Osterhout Depo. at 123.) Mr. Osterhout is unsure who is responsible for picking up prescriptions from the pharmacy and he did not identify Defendants Wenzel or Kostelecky as officers who theoretically might be responsible for picking up prescriptions. (SUF at ¶ 20.)

Mr. Osterhout was brought lunch on January 29, 2018 but he did not request his medication at that time. (SUF at ¶ 27.) Prior to the alleged January 29, 2018 seizure, Mr. Osterhout did not ask any officer for medical assistance. (SUF at ¶ 28.) Mr. Osterhout alleges he suffered another seizure on January 29, 2018 sometime after his 6:00 p.m. dinner and before the evening medical cart pass. (SUF at ¶ 29.) He has no idea how long his claimed seizure lasted. (SUF at ¶ 30.) The next thing Mr. Osterhout remembers is Jayson Kostelecky, Captain Seth Wenzel, Lane Grove, and Deputy Cordova taking his clothes off. He does not know whether he wet himself during this seizure. (Doc. 44-2 at 12: Osterhout Depo. at 125.) Mr. Osterhout admitted he was very confused and disoriented during this event. (SUF at ¶ 33.) After his clothes were removed, Mr. Osterhout was put into a green blanket suit. (SUF at ¶ 34.) Mr. Osterhout admitted he was not injured during the alleged January 29, 2018 seizure. (SUF at ¶ 36.)

IV.   **SUMMARY JUDGMENT ANALYSIS**

Although Mr. Osterhout alleges cruel and unusual punishment under the Eighth Amendment to the United States Constitution (Doc. 2 at 6), it is undisputed

9

that he was a pretrial detainee in January 2018. A pretrial detainee's (as opposed to a convicted prisoner's) constitutional rights relative to conditions of confinement are addressed under the due process clause of the Fourteenth Amendment, rather than the Eighth Amendment's prohibition against cruel and unusual punishment applicable to convicted inmates. *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1120 (9th Cir. 2003); *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1067-68 (9th Cir. 2016) (discussing the differing constitutional standards that apply to convicted inmates as opposed to pretrial detainees) (*citing Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (holding due process requires that a pretrial detainee may not be punished prior to a lawful conviction)).

Previously, "all conditions of confinement claims, including claims for inadequate medical care, were analyzed under a subjective deliberate indifference standard whether brought by a convicted prisoner under the Eighth Amendment or pretrial detainee under the Fourteenth Amendment." *Gordon v. County of Orange*, 888 F.3d 1118, 1122-23 (9th Cir. 2018) (*citing Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1242-43 (9th Cir. 2010)). The subjective "deliberate indifference" test requires a plaintiff to prove an officer's punitive intent or subjective awareness of the risk of harm. *Castro*, 833 F.3d at 1068. In 2015, however, the United States Supreme Court held that a pretrial detainee need not prove an officer's "subjective intent to punish" to support a Fourteenth

10

Amendment excessive force claim (as opposed to an Eighth Amendment claim). *Id.* at 1068-70 (*citing Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015)). In its place, the Ninth Circuit in *Castro* articulated an objective "deliberate indifference" test for Fourteenth Amendment failure-to-protect claims, holding a plaintiff need only prove that the officer's conduct was subjectively "intentional," but may then otherwise rely on "purely objective" evidence, rather than having to prove punitive intent or subjective awareness of risk. 833 F.3d at 1068-70.

Although the Ninth Circuit has not expressly extended the objective deliberate indifference standard to all pretrial detainee conditions of confinement claims beyond denial of medical care, failure-to-protect, and excessive force claims, the decision in *Gordon* strongly suggests it will do so. *See Gordon*, 888 F.3d at 1120, 1124, and 1124 n.2 (*citing Darnell v. Pineiro*, 849 F.3d 17, 36 (2nd Cir. 2017) (extending objective deliberate indifference standard to all pretrial detainee conditions of confinement claims)). As such, the Court will apply the objective indifference standard under the Fourteenth Amendment to Mr. Osterhout's claims. *See Gordon*, 888 F.3d at 1124-25 (applying objective standard to medical care claims and describing similar treatment afforded medical care and other conditions of confinement claims) (*citing Kingsley*, 135 S.Ct. 2466 and *Castro*, 833 F.3d at 1070.

To state a Fourteenth Amendment claim conditions of confinement claim, a

11

pretrial detainee must allege that (1) "the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined"; (2) "those conditions put the plaintiff at substantial risk of suffering serious harm"; (3) "the defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious"; and (4) "by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon*, 888 F.3d at 1125; *Castro*, 833 F.3d at 1071. "With respect to the third element, the defendant's conduct must be objectively unreasonable . . ." *Gordon*, 888 F.3d at 1125 (*quoting Castro*, 833 F.3d at 1071).

Therefore, Mr. Osterhout must show that a defendant caused him injury by "purposely or knowingly" failing to take appropriate measures to abate a risk of serious harm and that this failure was "objectively unreasonable." *Castro*, 833 F.3d at 1069 (*quoting Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472-73 (2015)). Showing an officer's actual awareness of the substantial risk of harm is not required, but a pretrial detainee must "prove more than negligence but less than subjective intent—something akin to reckless disregard" *Castro*, 833 F.3d at 1071; *Gordon*, 888 F.3d at 1125.

### A. Medication

There is no evidence that either Defendant made an intentional decision with

regard to Mr. Osterhout's seizure medication. It is undisputed that neither Defendant had any involvement in Mr. Osterhout's January 28, ,2018 seizures nor were they present in the treatment room at the hospital. (SUF at ¶¶ 14, 16.)

In the Complaint, Mr. Osterhout asserts there was a note from the doctor advising he would have another seizure if he did not receive his medication. Mr. Osterhout, however, has produced no such note in this litigation. In fact, he admitted that he does not have a copy of any such note, that the doctor did not put that note in any release papers, and that it is possible the directive was simply verbal. (SUF at ¶ 18.)

As such, there is no evidence that either Defendant was aware between 10:00 p.m. on January 28, 2018 when Mr. Osterhout was released from the hospital and 6:00 p.m. on January 29, 2018 when he allegedly had a seizure that Mr. Osterhout had been prescribed the seizure medication or that he needed the medication to prevent another seizure. Without evidence of any such knowledge, these Defendants cannot be held liable for the denial of that medication. Neither Wenzel nor Kostelecky had any involvement in Mr. Osterhout's medical treatment on January 28, 2018. Even assuming Dr. Michel told Mr. Osterhout that he was in danger of having another seizure if he did not receive his medication, Defendants were not present during the doctor's meeting with Mr. Osterhout and there is no evidence that this information was passed onto Defendants. Mr. Osterhout did not

13

tell Detention Center staff that he had not received his medication on January 29, 2018, despite coming into contact with them.  There is no allegation or evidence to suggest that Mr. Osterhout came into contact with either Defendant until he woke up from his seizure on January 29, 2018 and his clothes were being removed.

As such, summary judgment will be granted on this claim.

**B.  Removal of Clothing**

Defendants apparently deny that they were working in the Detention Center at the time of Mr. Osterhout's January 29, 2018 seizure but there is no evidence to this effect.  (MSJ Brief, Doc. 42 at 12, n.4.)  For purposes of the motion, however, they do not dispute that Mr. Osterhout's clothing was removed after his seizure event on January 29, 2018.  Defendants present no evidence establishing the purpose for the removal of Mr. Osterhout's clothes.  They suggest in their briefing without evidentiary support that Mr. Osterhout soiled himself during the January 29, 2018 seizure event as he had done during prior seizures.  (MSJ Brief, Doc. 42 at 12-13.)  Another explanation for the removal of Mr. Osterhout's clothing arises from a pre-sentence report which Mr. Osterhout filed which states:

> In the late hours of January29, 2018, [Mr. Osterhout] began banging his head on objects in his holding cell.  He then attempted to wrap a blanket around his neck in an apparent suicide attempt.  All blankets were taken from [Mr. Osterhout] and he was placed on suicide watch and put in a suicide smock.

(Doc. 49-1 at 2.)  As such, there remains an issue of fact regarding why Mr.

14

Osterhout's clothing was removed on January 29, 2018 by Detention Center staff.

Regardless of this issue of fact, the Court sees no basis for a federal claim based upon these allegations. There is no allegation or showing that the removal of Mr. Osterhout's clothing placed him at a substantial risk of suffering serious harm especially since he admits he was immediately placed in a green smock instead of his clothing.

Mr. Osterhout alleged in his Complaint, that the removal of his clothing violated his right to dignity. Montana's Constitution provides, "[t]he dignity of the human being is inviolable" recognizing that all human beings have the right to individual dignity. Mont. Const. art. II § 4. The U.S. Constitution does not expressly provide for the right to individual dignity. To establish a claim for a deprivation of the right to dignity, Mr. Osterhout must show Defendants "consciously disregarded a substantial risk of serious harm to [Plaintiff's] health or safety." *Wilson v. State*, 2010 MT 278, ¶ 32, 358 Mont. 438, 445, 249 P.3d 28 (citations omitted) (holding no violation where plaintiff failed to demonstrate defendant's actions exacerbated his illness or deprived him of his sanity).

As set forth above, Defendants "need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B). Defendants met that burden. There is an absence of evidence to support a contention that the

removal of Mr. Osterhout's clothing after his seizure was done for an improper purpose or was done in conscious disregard of a serious risk to his safety. His clothing was removed and he was immediately given a green blanket coat to put on.

Since Defendants met their initial responsibility of showing an absence of evidence to support Mr. Osterhout's claims regarding the removal of clothing, the burden shifts to Mr. Osterhout to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87. Mr. Osterhout has not met this burden. His only response is the conclusory statement that "Defendants are liable and that the summary judgment should be in the Plaintiffs favor, not the defendants." (Doc. 48.) This is insufficient to raise a genuine issue of material fact. Summary judgment will be granted.

## V. CONCLUSION

Defendants met their burden of proving "that there is an absence of evidence to support" Mr. Osterhout's denial of medical care claim and violations of his right to dignity. *See Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B). Mr. Osterhout, in turn, failed to establish that a genuine issue as to any material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Mr. Osterhout makes a single conclusory statement that summary judgment is inappropriate. This is insufficient.

There is a failure of proof concerning several essential elements of Mr. Osterhout's claims necessitating entry of summary judgment. *See Celotex*, 477 U.S. at 322. He has not tendered any evidence to establish a genuine issue of material fact regarding his claims of denial of medical care (lack of medication) or regarding the removal of his clothing. Mr. Osterhout provided no evidence to demonstrate that a reasonable jury could return a verdict in his favor. See *Anderson*, 477 U.S. at 248. Defendants are entitled to summary judgment.

Based upon the foregoing, the Court issues the following:

## ORDER

1. Defendants' Motion to Deem Requests for Admission Admitted (Doc. 36) and Motion to Deem Defendants' Motion re: Admissions (Doc. 36) Well Taken (Doc. 52) are GRANTED IN PART. The Court has presumed the authenticity of the documents addressed in Defendants' motion. It has, however, given Mr. Osterhout the benefit of the doubt regarding whether he refused his medications on January 29, 2018.

2. Defendants' Motion for Summary Judgment (Doc. 41) is GRANTED and this matter is DISMISSED. The Clerk shall enter judgment in favor of Defendants and close this matter.

3. The Clerk of Court shall have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any

appeal of this decision would not be taken in good faith.

DATED this 17th day of August, 2020.

                                       */s/ John Johnston*
                                       John Johnston
                                       United States Magistrate Judge